## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FIRST LOOK INSTITUTE, INC., et al.,

     Plaintiffs,

     v.

U.S. AGENCY FOR GLOBAL MEDIA,

     Defendant.

Civil Action No. 20-3499 (TJK)

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR AN AWARD OF ATTORNEYS' FEES AND COSTS

Burt Braverman (DC Bar No. 178376)
Meenakshi Krishnan (DC Bar No. 1617229)
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005
202-973-4200
burtbraverman@dwt.com
meenakshikrishnan@dwt.com

Thomas R. Burke
Davis Wright Tremaine LLP
50 California Street, Suite 2300
San Francisco, CA 94111
415-276-6552
thomasburke@dwt.com

*Counsel for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

**Page**

I.    PRELIMINARY STATEMENT ...................................................................................1

II.   FACTUAL BACKGROUND .....................................................................................2

    A.    CEO Michael Pack's Politicization of VOA and the J-1 Visa Controversy ........... 2

    B.    USAGM Produced Records Only After Plaintiffs Filed Suit ................................. 3

III.  THE COURT SHOULD AWARD PLAINTIFFS THEIR FEES AND COSTS ...............7

    A.    Plaintiffs Are Eligible To Recover Fees and Costs ................................................. 8

    B.    Plaintiffs Are Entitled To Recover Fees and Costs ................................................. 9

        1.    The Public Interest Factor Weighs Strongly In Plaintiffs' Favor ............ 10

        2.    Plaintiffs Solely Sought To Inform The Public With Its Records
             Requests And Receive No Commercial Benefit ...................................... 11

        3.    USAGM Had No Reasonable Basis For Not Disclosing The
             Requested Records Until After Plaintiffs Filed Suit ................................. 13

IV.   THE ATTORNEYS' FEES SOUGHT BY PLAINTIFFS ARE REASONABLE ............14

    A.    The Number of Hours Expended is Reasonable ................................................... 15

    B.    The Hourly Rate Charged is Reasonable ............................................................. 16

V.    CONCLUSION ......................................................................................................18

## **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Am. Immigration Council v. DHS*,
    82 F. Supp. 3d 396 (D.D.C. 2015) ....................................................................................17

*Am. Oversight v. U.S. Dep't of Justice*,
    375 F. Supp. 3d 50 (D.D.C. 2019) ....................................................................................15

*Brayton v. Office of U.S. Trade Rep.*,
    641 F.3d 521 (D.C. Cir. 2011) .......................................................................................8, 9

*Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Justice*,
    80 F. Supp. 3d 1 (D.D.C. 2015) ......................................................................................17

*Citizens for Responsibility & Ethics in Wash. v. FEC*,
    66 F. Supp. 3d 134 (D.D.C. 2014) ..................................................................................14

*Cotton v. Heyman*,
    63 F.3d 1115 (D.C. Cir. 1995) .........................................................................................10

*Davy v. CIA*,
    550 F.3d 1155 (D.C. Cir. 2008) ...................................................................................7, 13

*Dorsen v. SEC*,
    15 F. Supp. 3d 112 (D.D.C. 2014) ....................................................................................8

*Elec. Privacy Info Ctr. v. DHS*,
    218 F. Supp. 3d 27 (D.D.C. 2016) ...........................................................................8, 10, 15

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*,
    999 F. Supp. 2d 61 (D.D.C. 2013) ..................................................................................12

*Elec. Privacy Info. Ctr. v. U.S. Drug Enforcement Admin.*,
    266 F. Supp. 3d 162 (D.D.C. 2017) ..................................................................................7

*Grand Canyon Tr. v. Bernhardt*,
    947 F.3d 94 (D.C. Cir. 2020) ............................................................................................9

*Judicial Watch, Inc. v. U.S. Dep't of Justice*,
    774 F. Supp. 2d 225 (D.D.C. 2011) ................................................................................14

*Kwoka v. IRS*,
    989 F.3d 1058 (D.C. Cir. 2021) .........................................................................................1

*Mattachine Soc'y of Wash. v. U.S. Dep't of Justice*,
    406 F. Supp. 3d 64 (D.D.C. 2019) ..................................................................................17

*McKinley v. Fed. Hous. Fin. Agency*,
    739 F.3d 707 (D.C. Cir. 2014) ...................................................................7, 10

*Morley v. CIA*,
    810 F.3d 841 (D.C. Cir. 2016) .......................................................................10

*Morley v. CIA*,
    894 F.3d 389 (D.C. Cir. 2018) .........................................................................9

*People for the Ethical Treatment of Animals v. NIH*,
    130 F. Supp. 3d 156 (D.D.C. 2015) ................................................................8

*Public.Resource.org v. IRS*,
    2015 WL 9987018 (N.D. Cal. Nov. 20, 2015) ..............................................17

*Queen Anne's Conservation Ass'n v. U.S. Dep't of State*,
    800 F. Supp. 2d 195 (D.D.C. 2011) ..............................................................14

*Reyes v. U.S. Nat'l Archives & Records Admin.*,
    356 F. Supp. 3d 155 (D.D.C. 2018) .........................................................12, 13

*Save Our Cumberland Mountains, Inc. v. Hodel*,
    651 F. Supp. 1528 (D.D.C. 1986) .................................................................17

*Sierra Club v. EPA*,
    2021 WL 7210058 (D.D.C. Mar. 31, 2021)....................................................9

*Summers v. U.S. Dep't of Justice*,
    477 F. Supp. 2d 56 (D.D.C. 2007), *aff'd*, 569 F.3d 500 (D.C. Cir. 2009) ..............14

*Urban Air Initiative, Inc. v. EPA*,
    442 F. Supp. 3d 301 (D.D.C. 2020) ................................................................9

**Federal Statutes**

5 U.S.C.
    § 552(a)(4)(E) (Freedom of Information Act) ............................................. *passim*
    § 552(a)(4)(E)(i)...............................................................................................7
    § 552(a)(4)(E)(ii) .............................................................................................8
    § 552(a)(6)(C)(i) ..............................................................................................5

Pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552(a)(4)(E), Plaintiffs First Look Institute, Inc. and Lee Fang ("Plaintiffs") hereby submit this Memorandum of Points and Authorities in Support of their Motion for Attorneys' Fees and Costs.

## I.    PRELIMINARY STATEMENT

FOIA provides that a plaintiff who has "substantially prevailed" may be awarded reasonable attorney fees and costs. 5 U.S.C. § 552(a)(4)(E). FOIA's fee recovery provision fulfills two objectives: (1) "to encourage Freedom of Information Act suits that benefit the public interest" and (2) to provide "compensation for enduring an agency's unreasonable obduracy in refusing to comply with [FOIA's] requirements." *Kwoka v. IRS*, 989 F.3d 1058, 1063 (D.C. Cir. 2021) (citations omitted). The fees provision disincentivizes "administrative resistance to disclosure requests" based not on the "merits" but rather the "knowledge that many FOIA plaintiffs" lack financial resources to pursue their requests. *Id.*

Pursuant to these principles, and as the prevailing parties in this action, Plaintiffs are both eligible and entitled to recover their attorneys' fees and costs. Defendant United States Agency for Global Media ("USAGM") wrongfully withheld thousands of pages of documents related to its suspension and termination of the J-1 visas, of a number of Voice of America ("VOA") foreign journalists based on political, and xenophobic, motivations. Plaintiffs made their original FOIA request on October 7, 2020. USAGM failed to timely acknowledge, and indeed never responded to, the request. Instead, USAGM's productions came only in response to Plaintiffs' filing of the Complaint and initiation of litigation, and even then, only months later through piecemeal disclosures.

Because Plaintiffs were forced to bring this action in order to obtain the requested documents, and due to USAGM's unreasonable tardiness, errors, and misrepresentations in

1

prolonging this litigation, Plaintiffs' counsel have devoted significant time and litigation costs in representing Plaintiffs in this matter.

Therefore, Plaintiffs request that the Court order USAGM to pay in full the attorneys' fees that Plaintiffs incurred in prosecuting this litigation, in the amount of $224,339.50, including fees incurred in connection with this Motion, and $402 in costs, for a total of **$224,741.50**.  As set forth below, this fee request is reasonable because both the hourly rates charged and hours expended were reasonable, particularly in light of USAGM's intransigence and delays.  The request is also consistent with the range of awards found to be reasonable by other courts, and is supported by the accompanying Declarations of Burt Braverman ("Braverman Decl."), Thomas Susman ("Susman Decl."), David Bralow ("Bralow Decl."), and Brian Fanning ("Fanning Decl.").

## II.    FACTUAL BACKGROUND

### A.    CEO Michael Pack's Politicization of VOA and the J-1 Visa Controversy

For decades, Voice of America (VOA), a news service associated with USAGM, has been respected worldwide for its independence and objectivity, along with its sister broadcast services Radio Free Europe, Radio Free Asia, and Radio Liberty.  Susman Decl. ¶ 6.  During the final year of his presidency, former President Trump repeatedly criticized VOA's coverage of his administration.[1]  *Id.*  A few months later, former President Trump appointed Michael Pack as the new CEO of USAGM, reportedly an attempt to steer more favorable coverage of the Administration's policies and actions.  *Id.*

---

[1] *See, e.g.*, Elizabeth Williamson, *White House Mounts Heated Attack on a U.S. Government Media Voice*, N.Y. TIMES (Apr. 10, 2020), https://www.nytimes.com/2020/04/10/us/politics/white-house-voice-of-america.html; David Folkenflik, *White House Attacks Voice Of America Over China Coronavirus Coverage*, NPR (Apr. 10, 2020), https://www.npr.org/2020/04/10/831988148/white-house-attacks-voice-of-america-over-china-coronavirus-coverage.

Shortly after Mr. Pack was appointed, he fired the chiefs of several news services under USAGM's purview and replaced them with political appointees. *Id.* Over the next few months, Mr. Pack and his administration refused to extend and approve J-1 visas to foreign nationals working as VOA journalists, resulting in the expulsion of some of them from the U.S. and leaving them vulnerable to retaliation in their home countries for their reporting. *Id.* ¶ 7. Mr. Pack and his staff also sought to eliminate the statutorily required firewall that is intended to protect VOA and other USAGM news services' editorial independence from politically motivated interference by USAGM; launched investigations of the services' journalists for alleged anti-Trump bias; paid a private law firm to conduct investigations that were later condemned as witch hunts and a waste of millions of dollars of public funds; and attempted to ferret out supposed "spies" at the agency. *Id.* As all of these events unfolded, numerous journalists across the nation and abroad, including at *The Intercept*, reported on the story with the limited information available. *Id.* Mr. Pack's denial of visa extensions for foreign VOA journalists also drew significant congressional and public concern and scrutiny. *Id.*

**B.    USAGM Produced Records Only After Plaintiffs Filed Suit**

On October 7, 2020, against the backdrop of these events and the ongoing J-1 visa firestorm, Plaintiffs submitted a FOIA request to USAGM. Compl. Ex. A, Dkt. No. 1-1. At the time, *The Intercept*, like other news outlets, including the Washington Post, New York Times, and National Public Radio, had reported on USAGM, the firing of VOA journalists and editorial staff, and the related controversies that plagued Mr. Pack's brief tenure. *Id.*; Bralow Decl. ¶ 4.

Plaintiffs sought records shedding light on USAGM's adverse actions against VOA foreign journalists with J-1 visas to determine whether there was a genuine factual basis for Mr. Pack's professed national security concerns, on which USAGM based its suspension and termination of VOA foreign journalists, or whether the national security allegations merely served as pretext for

3

politically and/or xenophobically motivated actions. Compl. Ex. A, Dkt. No. 1-1. In particular, *inter alia*, Plaintiffs requested records pertaining to the procedures and standards employed by the agency in vetting the security background of VOA's foreign journalists, the policies underlying the relevant firing and suspension decisions, and whether Mr. Pack and USAGM acted with the approval or at the behest of President Trump, White House staff, or President Trump's former advisor, Steve Bannon. *Id.*

As nonprofit journalists, Plaintiffs requested expedited processing, noting that the request:

> bear[s] on the imminent termination of employment, expiration of authorization to remain in the United States, and expulsion from the United States, of foreign journalists employed by USAGM and/or VOA, and the legality of the actions, or inaction, of USAGM and VOA. These records are crucial to the public's understanding of the bases for such actions or inaction. Delay in production of these documents could result in the expulsion from the United States of foreign journalists who will be forced to return to countries where, because of the service they have rendered to VOA and USAGM, they may be subjected to harassment, retaliation, imprisonment or the infliction of serious harm.

*Id.*

Plaintiffs also requested a fee waiver, based on their status as "representative[s] of the news media" and their non-commercial use and interest in the information; the fact that the sought-after disclosures are in the public interest "because the records concern, and will meaningfully and significantly contribute to the public's understanding of, the operations, activities and decision-making of USAGM and VOA with respect to the hiring and firing of foreign journalists, whether such actions have been politically motivated and will violate the statutory 'firewall' that is intended to protect the editorial independence of VOA and its journalists from interference by the government, and whether USAGM management has abused its powers and discretion or committed other unlawful acts"; and the fact that the requested records "concern matters that are of significant interest to the public, as evidenced by the widespread attention the underlying issues

4

have received in the media, from members and committees of Congress, and even in the comments of the CEO of USAGM, Michael Pack." *Id.*

USAGM never responded to, or even acknowledged, Plaintiffs' FOIA request, or provided any explanation for its failure to respond, and therefore failed to comply with the applicable time provisions of FOIA.[2] Compl. ¶ 5; 5 U.S.C. § 552(a)(6)(C)(i).

Nearly two months later, on December 1, 2020, having received no response from USAGM, Plaintiffs were forced to file this lawsuit to compel the production of responsive records. Even after initiation of the lawsuit, USAGM still took over two months to make its first production on February 8, 2021.  Braverman Decl. ¶ 7.  Over the next several months, Plaintiffs' counsel engaged in extensive and prolonged negotiations with USAGM's agency and in-house counsel— who changed no less than three times and two times, respectively, which further delayed the productions—to narrow the search terms and custodians searched solely in the hopes of expediting USAGM's document productions. *Id.* ¶¶ 7, 9.  While USAGM attempted to justify the sluggish pace of its production based on supposed staffing shortages, the fact is that the agency's actions – or more accurately inaction – extended the length of the litigation, and the scope of negotiations to such an extent that the parties had to file 20 Joint Status Reports.  Due solely to USAGM's delays, it did not make its final production until December 8, 2021, one year after the case was filed.  *Id.* ¶ 7.

---

[2] Plaintiff's counsel, Burt Braverman, even exceeded his statutory obligations and emailed FOIA Liaison Daniel Rosenholtz on November 10, 2020, seeking confirmation that USAGM received *The Intercept*'s October 7, 2020 request.  Neither Mr. Rosenholtz nor USAGM responded to this email.  On November 10, 2020, Mr. Fang called USAGM, seeking confirmation that his FOIA request had been received.  He spoke with Mr. Rosenholtz, who said he did not know but would inquire.  Mr. Rosenholtz called Mr. Fang on November 19 to tell him only that the FOIA request had been received.  Plaintiffs received no further response from USAGM regarding their FOIA request. Compl. ¶ 32 n.17.

Even then, USAGM's productions were incomplete, and resulted in Plaintiffs' counsel having to perform a significant amount of additional work.  In January 2022, after reviewing all of the records disclosed to that date, Plaintiffs discovered that USAGM had failed to produce a significant number of email attachments, even though the agency previously represented directly to Plaintiffs' counsel and in its transmittal letters that responsive attachments to produced emails were produced "generally immediately after that document," except when an entire attachment was claimed to be exempt.  *See* January 7, 2022 Joint Status Report, Dkt. No. 26; Braverman Decl. ¶ 8.  Instead of independently assessing whether its productions were complete as previously represented, USAGM then unreasonably forced Plaintiffs' counsel to engage in a significantly time-consuming and painstaking exercise of sorting through more than 10,000 pages of documents to identify to USAGM which email attachments were missing from the agency's productions; a sixteen-page list of attachments was identified by Plaintiffs' counsel as being missing, and nearly 400 attachments were ultimately found to have been produced out of order among the 10,000 pages of disclosed documents.  *See* May 4, 2022 Joint Status Report, Dkt No. 30; Braverman Decl. ¶ 8.  Many months later, USAGM belatedly admitted that not all email attachments had been produced, contradicting its prior repeated representations, and only after Plaintiffs repeatedly pressed the issue and did the agency's work of identifying the missing, or mis-located, documents.  *See* May 4, 2022 Joint Status Report, Dkt. No. 30; Braverman Decl. ¶ 8.  Only after several more months, on October 28, 2022, did USAGM fully complete its production of responsive records, nearly two years after the case was filed.  *See* November 8, 2022 Joint Status Report, Dkt. No. 34; Braverman Decl. ¶ 8.  By that time, and only as a result of Plaintiffs' diligent prosecution of this litigation, USAGM had produced over 10,000 pages of responsive records.  Braverman Decl. ¶ 13.

On May 8, 2023, the parties filed their 20th Joint Status Report notifying the Court that they had resolved all merits issues and that the parties were pursuing an informal fees settlement. Dkt. No. 37.  On June 30, 2023, in an attempt to avoid motion practice over fees, Plaintiffs provided USAGM's counsel with an eight-page letter detailing their fees request, the basis for their fees position, and an itemized list of billing entries.  Braverman Decl. ¶ 10.  On August 7, 2023, USAGM's counsel informed Plaintiffs' counsel that USAGM had not had time to review the fees request and asked for an additional 30 days.  *Id.*; *see* August 9, 2023 Joint Status Report, Dkt. No. 38.  On September 7, 2023, USAGM flatly refused to settle the fees dispute informally, without providing any explanation or counter-offer.  Braverman Decl. ¶ 10.

## III.    THE COURT SHOULD AWARD PLAINTIFFS THEIR FEES AND COSTS

Plaintiffs should recover their attorneys' fees under FOIA as a prevailing party.  To recover attorneys' fees pursuant to FOIA, a party must be both eligible for and entitled to fees.  *McKinley v. Fed. Hous. Fin. Agency*, 739 F.3d 707, 710 (D.C. Cir. 2014).  First, a plaintiff is *eligible* to recover fees when it has "substantially prevailed."  *Elec. Privacy Info. Ctr. v. U.S. Drug Enforcement Admin.*, 266 F. Supp. 3d 162, 167 (D.D.C. 2017) (citing 5 U.S.C. § 552(a)(4)(E)(i)).  Second, as to whether a plaintiff is *entitled* to fees, courts weigh four factors: "(1) the public benefit derived from the case; (2) the commercial benefit to the plaintiff; (3) the nature of the plaintiff's interest in the records; and (4) the reasonableness of the agency's withholding of the requested documents."  *Davy v. CIA*, 550 F.3d 1155, 1159 (D.C. Cir. 2008) (citation omitted).  Here, Plaintiffs are both eligible for and entitled to fees because their dogged pursuit of this action has culminated in the release of a significant tranche of records that carry a substantial public benefit.

A.       **Plaintiffs Are Eligible To Recover Fees and Costs**

Plaintiffs "substantially prevailed," and are therefore eligible for fees and costs, because their prosecution of this lawsuit is the sole reason that USAGM released more than 10,000 pages of records related to USAGM's suspension or termination of foreign VOA journalists.

A "plaintiff has 'substantially prevailed' in a FOIA action, and become eligible for a fee award under the statute, if it 'obtained relief through either – (I) a judicial order, or an enforceable written agreement or consent decree; or (II) a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial.'" *People for the Ethical Treatment of Animals v. NIH*, 130 F. Supp. 3d 156, 161 (D.D.C. 2015) (quoting 5 U.S.C. § 552(a)(4)(E)(ii)). Importantly, a plaintiff can "substantially prevail" even in the absence of court-ordered relief on the merits of the FOIA claim, which guards against agencies dragging their feet on disclosure until the last minute prior to a court judgment. *Brayton v. Office of U.S. Trade Rep.*, 641 F.3d 521, 525 (D.C. Cir. 2011). Federal courts in this District have awarded fees where a plaintiff's lawsuit caused an agency to "release responsive records" where they otherwise had not, and therefore the plaintiff "substantially prevailed." *Elec. Privacy Info Ctr. v. DHS*, 218 F. Supp. 3d 27, 43 (D.D.C. 2016); *see also Dorsen v. SEC*, 15 F. Supp. 3d 112, 118 (D.D.C. 2014) (plaintiff substantially prevails when demonstrating that "the institution and prosecution of the litigation cause[d] the agency to release the documents obtained during the pendency of the litigation") (citation omitted).

There is no dispute that prior to the initiation of this lawsuit, USAGM had not produced a single page of the requested documents related to USAGM's termination or suspension of foreign journalists employed by VOA; indeed, USAGM had not responded to, acknowledged, or provided any indication that it intended to release records in response to Plaintiffs' FOIA request.

Only the filing of the December 2020 Complaint against USAGM prompted the agency to search for and release the requested records in response to Plaintiffs' initiation of litigation. In short, Plaintiffs' prosecution of this lawsuit is the only reason that USAGM disclosed over 10,000 records regarding the controversy related to the politically motivated termination of VOA's foreign journalists. Plaintiffs have easily met their "burden of demonstrating 'that it is more probable than not that the government would not have performed the desired act absent the lawsuit.'" *Sierra Club v. EPA*, 2021 WL 7210058, at *1 (D.D.C. Mar. 31, 2021) (quoting *Grand Canyon Tr. v. Bernhardt*, 947 F.3d 94, 97 (D.C. Cir. 2020)).

Because Plaintiffs' suit was necessary to ensure USAGM's compliance with FOIA, and because Plaintiffs' suit exclusively caused the release of the records they sought, Plaintiffs have substantially prevailed and are eligible for fees.

## B. Plaintiffs Are Entitled To Recover Fees and Costs

Once the Court determines that a plaintiff is eligible for fees and costs, it must next determine whether the plaintiff is *entitled* to those fees and costs. *Brayton*, 641 F.3d at 525. As explained above, the D.C. Circuit applies a four-factor test in assessing entitlement to fee awards under FOIA: "(1) the public benefit from the case; (2) the commercial benefit to the plaintiff; (3) the nature of the plaintiff's interest in the records; and (4) the reasonableness of the agency's withholding of the requested documents." *Morley v. CIA*, 894 F.3d 389, 391 (D.C. Cir. 2018). Courts balance all of the factors to determine whether a plaintiff is ultimately entitled to a fee award. No factor is dispositive, and the balancing is left to the district court's discretion. *Urban Air Initiative, Inc. v. EPA*, 442 F. Supp. 3d 301, 314 (D.D.C. 2020). As set forth below, these factors support an award of fees and costs to Plaintiffs.

### 1.     The Public Interest Factor Weighs Strongly In Plaintiffs' Favor

In determining whether the "public benefit" factor weighs in favor of granting a fee award, courts look to "the significance of the contribution that the released information makes to the fund of public knowledge." *McKinley*, 739 F.3d at 711.  When determining the public benefit, a court "evaluate[s] the specific documents at issue in the case at hand" and "determines whether the plaintiff's lawsuit 'is likely to add to the fund of information that citizens may use in making vital political choices.'" *Elec. Privacy Info Ctr.*, 218 F. Supp. 3d at 44 (quoting *Cotton v. Heyman*, 63 F.3d 1115, 1120 (D.C. Cir. 1995)); *see also Morley v. CIA*, 810 F.3d 841, 844 (D.C. Cir. 2016) (noting that information has a public value when it affects a matter of public concern).  Here, the public interest factor weighs strongly in Plaintiffs' favor.

Without question,  Plaintiffs' litigation resulted in the disclosure of more than 10,000 pages of records that shed light on a matter of great public interest and importance: the true nature of, and motivations underlying, USAGM's suspension and/or termination of numerous VOA foreign journalists.

*First*, the records reflect that, despite numerous pleas from VOA and USAGM staff, Mr. Pack and USAGM senior officials delayed renewal of the foreign journalists' J-1 visas without any reason or justification for the delay and without providing any support for the pretextual allegation that the journalists were potential spies.  Susman Decl. ¶ 10.  For example, the records uncovered that it was not until mid-October 2020, months after the denials of visas began, that Mr. Pack and his senior leadership drafted a memorandum purporting to justify their posture regarding J-1 visas, but even then, no memorandum was publicly issued until mid-January 2021.  *Id.*

*Second*, the records show that VOA's professional editorial staff repeatedly implored Mr. Pack and USAGM senior officials to renew the journalists' J-1 visas, supporting their requests

with extended explanations of the significant adverse impact that Mr. Pack's and USAGM's actions were having on VOA's multiple news services' operations. *Id.* ¶ 11.

*Third*, the records reveal that Mr. Pack and USAGM senior officials regularly communicated with the White House regarding the J-1 visa controversy, including security clearance revocation authority, as well as other issues such as circumvention of the USAGM statutory firewall and litigations brought by terminated VOA employees against USAGM. *Id.* ¶ 12. The disclosed documents confirmed that Mr. Pack's and USAGM's actions were taken to accomplish the "President's agenda." *Id.* At the same time, Mr. Pack and his senior leadership repeatedly stonewalled all attempts at Congressional oversight, leading one congressional staffer to remark that "in my near 25 years on the Hill, I have never seen an agency so unresponsive to oversight." *Id.* ¶¶ 13-14.

*Fourth*, the records establish Mr. Pack and senior USAGM officials investigated their own agency, employees, and services, using a private law firm, and attempted to expand their security clearance revocation authority through repeated requests to a senior Trump advisor. *Id.* ¶ 15.

By unearthing this wealth of information, Plaintiffs have made it possible not only for themselves, but for other journalists, scholars, and the public at large to understand what happened at USAGM during Mr. Pack's tenure, why it happened, and the grave threat that it posed to independent and objective journalism at VOA and its sister news services. *Id.* ¶ 16. Accordingly, Plaintiffs have established that, indisputably, the public benefitted significantly from disclosure of the released records.

>    **2.    Plaintiffs Solely Sought To Inform The Public With Its Records Requests And Receive No Commercial Benefit**

Under the second and third factors, courts analyze a plaintiff's interest in and potential commercial benefit from the records sought together "to determine whether the plaintiff has a

sufficient private incentive to seek disclosure of the documents without expecting to be compensated for it." *Reyes v. U.S. Nat'l Archives & Records Admin.*, 356 F. Supp. 3d 155, 165 (D.D.C. 2018) (citations and internal quotation marks omitted). These factors are interrelated and often considered together. *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 999 F. Supp. 2d 61, 69 (D.D.C. 2013). These factors presumptively "favor non-profit organizations … which aim to ferret out and make public worthwhile, previously unknown government information" because it is "precisely the activity that FOIA's fees provision seeks to promote." *Id.* (citation and internal quotation marks omitted).

Plaintiffs are a nonprofit media entity and an independent journalist who receive no direct commercial benefit or gain from any of their reporting activities, including the FOIA request at issue here. Bralow Decl. ¶ 3. As established above, Plaintiffs' pursuit of and interest in the records were driven solely by their efforts to inform the public about the events related to VOA foreign journalists that transpired during Mr. Pack's tenure and the impact of those actions on VOA's objective news reporting activities. Plaintiffs sought to expose to public scrutiny the motives for the actions CEO Pack took against VOA's foreign journalists, so that the public could be informed of whether those actions threatened the journalistic independence of VOA required under its statutory firewall protections, whether Mr. Pack's actions were being directed by the White House, and whether Mr. Pack was utilizing a xenophobic ploy to justify actions aimed at politicizing VOA. *Id.* ¶¶ 10-11.

Indeed, consistent with its reporting mission to hold the powerful accountable, *The Intercept* routinely relies on public records requests—and, where necessary, FOIA litigation—to conduct its reporting, and as a nonprofit, depends on FOIA's statutory fee provisions to be able to pursue these lawsuits of significant public value. *Id.* ¶¶ 6-8.

Plaintiffs therefore readily satisfy the second and third factors showing entitlement to attorneys' fees and costs.

> **3.    USAGM Had No Reasonable Basis For Not Disclosing The Requested Records Until After Plaintiffs Filed Suit**

USAGM's steadfast refusal to release the requested records was patently unreasonable. *See Davy*, 550 F.3d at 1162 ("The fourth factor considers whether the agency's opposition to disclosure 'had a reasonable basis in law,' and whether the agency 'had not been recalcitrant in its opposition to a valid claim or otherwise engaged in obdurate behavior.'") (internal citations omitted). "The question is not whether [the plaintiff] has affirmatively shown that the agency was unreasonable, but rather whether the agency has shown that it had any colorable or reasonable basis for not disclosing the material until after [the plaintiff] filed suit." *Reyes*, 356 F. Supp. 3d at 166 (alterations in original) (citation omitted).

Here, in violation of statutory time limits, after receiving Plaintiffs' FOIA request, USAGM did absolutely nothing; it neither responded to nor even acknowledged the request. Even after Plaintiffs inquired about the status of their request and when USAGM would respond, the agency remained mute. It was USAGM's complete dereliction of its obligations under FOIA that caused Plaintiffs to have to initiate and prosecute this litigation. USAGM cannot provide any reasonable basis for its failure to produce even a single record until after Plaintiffs filed suit. Nor can it justify its repeated delays during the pendency of this lawsuit in producing responsive documents, its failure to produce attachments, its shifting to Plaintiffs of the burden of identifying missing attachments, or its painfully slow production of the responsive records over the course of two years when the information within the records could have informed the public. *See Reyes*, 356 F. Supp. 3d at 168 (purpose of fourth factor to "incentiviz[e] the government to promptly turn over—before litigation is required—any documents that it ought not withhold" would be stymied

if "it were reasonable for agencies to withhold documents for indeterminate periods of time because they have too many FOIA requests and too few FOIA staff members").  Plaintiffs have satisfied the fourth factor.

## IV.    THE ATTORNEYS' FEES SOUGHT BY PLAINTIFFS ARE REASONABLE

Courts determine "the proper amount of the fee award" after determining that a plaintiff is eligible for and entitled to attorneys' fees.  *Summers v. U.S. Dep't of Justice*, 477 F. Supp. 2d 56, 63 (D.D.C. 2007), *aff'd*, 569 F.3d 500 (D.C. Cir. 2009).  Courts use the lodestar method of "multiply[ing] the hours reasonably expended in the litigation by a reasonable hourly fee" to calculate the fee award.  *Citizens for Responsibility & Ethics in Wash. v. FEC*, 66 F. Supp. 3d 134, 148 (D.D.C. 2014) (citations and internal quotation marks omitted).

"To determine the appropriate hourly rate, the Circuit recognizes that a fee applicant bears the burden of justifying the reasonableness of his requested hourly rate by showing at least three elements: the attorneys' billing practices; the attorneys' skill, experience, and reputation; and the prevailing market rates in the relevant community."  *Queen Anne's Conservation Ass'n v. U.S. Dep't of State*, 800 F. Supp. 2d 195, 199 (D.D.C. 2011) (citation and internal quotation marks omitted); *see also Judicial Watch, Inc. v. U.S. Dep't of Justice*, 774 F. Supp. 2d 225, 232 (D.D.C. 2011) ("[A] reasonable hourly fee is determined 'according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or non-profit counsel.'") (citation omitted).  "After the fee applicant has provided sufficient evidence to support the requested rate, the burden falls on the government to rebut the requested rate, but it must do so with equally specific countervailing evidence."  *Queen Anne's Conservation Ass'n* (citation and internal quotation marks omitted).  Here, the numbers of hours expended by and the rates billed by Plaintiffs' counsel are reasonable.

14

### A.    The Number of Hours Expended is Reasonable

The hours expended by Plaintiffs' counsel were reasonable in litigating this matter. Plaintiffs should be awarded fees associated with preparing and filing the Complaint; obtaining the release of responsive records through numerous discussions and negotiations with USAGM's counsel; reviewing the responsive records to ascertain search adequacy and completeness of production; pressing for the release of missing and wrongfully withheld documents; preparation of 20 Joint Status Reports; preparation of this fees Motion; and otherwise prosecuting the litigation. Plaintiffs have narrowly tailored their request to activities that contributed to ultimately compelling productions over the course of two years and prompting a more thorough review in response to Plaintiffs' FOIA request, and to the fees dispute in this case.   In total, Plaintiffs' counsel spent **289.8** hours on these tasks.

In support of this motion, Plaintiffs have submitted an itemized billing summary describing in detail the hours worked, by whom, and the tasks completed.  Braverman Decl. ¶ 18, Ex. A.  The billing summary reflects hours billed in this action since inception (in six minute increments), including fees incurred in connection with this Motion that also are recoverable.  *EPIC*, 218 F. Supp. 3d at 51 ("Hours reasonably devoted to a request for fees are compensable."); *Am. Oversight v. U.S. Dep't of Justice*, 375 F. Supp. 3d 50, 72 (D.D.C. 2019) (same).

It is noteworthy that USAGM's delays, and its incomplete and inaccurate production, were directly responsible for the magnitude of fees involved in this case.  As explained above, instead of expeditiously reviewing and producing responsive records, it took twelve months—until December 8, 2021—for USAGM to finish and provide what it explicitly represented to be a complete production of responsive records.  Those delayed productions were provided only after Plaintiffs agreed to significantly narrow the custodians and search terms to be used by USAGM to

locate responsive files, to which Plaintiffs agreed only in order to expedite the delayed productions, while reserving rights to add additional search terms and custodians at a later time. Plaintiffs were required to review thousands of pages in order to determine whether USAGM's searches were adequate; whether documents had been produced from all identified custodians; and whether additional search terms and custodians were necessary.

Only because of Plaintiffs' counsel's meticulous review of the documents did they discover that despite USAGM's express representation to the contrary, it in fact had not completed production of responsive records and instead had omitted important attachments to hundreds of documents or buried them elsewhere in the productions. Then, rather than itself correcting what was obviously an incomplete and inaccurate production, USAGM required Plaintiffs to go through the thousands of pages of produced documents to specifically identify where attachments were missing, i.e., to do USAGM's job. Beyond that, by stretching the course of the litigation out over more than two-and-one-half years, it necessitated preparation of twenty Joint Status Reports, which added a significant amount of time that was spent by the parties negotiating the terms of those JSRs. Likewise, USAGM's assigned Assistant U.S. Attorney for the case changed no less than three times, and USAGM's in-house counsel changed two times, each of which change resulted in further delays and additional time that had to be spent by Plaintiffs' counsel in coordinating with USAGM's new representatives.

In light of these circumstances and the volume of documents produced in this matter, Plaintiffs' counsel's expended hours are reasonable. *See generally* Susman Decl. ¶¶ 17-24.

### B.    The Hourly Rate Charged is Reasonable

As courts in this District have found, if "an attorney is involved in private practice the hourly rate charged for his or her services is presumptively a reasonable rate." *Save Our*

*Cumberland Mountains, Inc. v. Hodel*, 651 F. Supp. 1528, 1537 (D.D.C. 1986); *see also Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Justice*, 80 F. Supp. 3d 1, 4 (D.D.C. 2015) (looking to "law firm billing rates as a benchmark for the reasonableness of the rates proposed"); *Am. Immigration Council v. DHS*, 82 F. Supp. 3d 396, 409 (D.D.C. 2015) (noting that the Government recognized that the hourly rates actually charged by Dorsey & Whitney LLP, a national law firm, were reasonable). "[T]here is no better indication of what the market will bear than what the lawyer in fact charges for his [or her] services and what the clients are willing to pay." *Mattachine Soc'y of Wash. v. U.S. Dep't of Justice*, 406 F. Supp. 3d 64, 70 (D.D.C. 2019) (alteration original).

The hourly rates billed by the attorneys involved in this action are:

- Burt Braverman: $910 (2020); $960 (2021); $1,055 (2022); $1,190 (2023)

- Thomas Burke: $810 (2020); $845 (2021); $895 (2022); $995 (2023)

- Meenakshi Krishnan: $435 (2020); $455 (2021); $545 (2022); $635 (2023)

These rates are commensurate with the rates charged by these attorneys, and their firm Davis Wright Tremaine LLP ("DWT"), to paying clients over the relevant time period and reflect the comparable skill and experience of the attorney biller. Fanning Decl. ¶¶ 3-6. These rates are also commensurate with the billing rates of peer attorneys in the Washington, D.C., and San Francisco markets. *Id.* ¶¶ 4-6. In fact, DWT's actual hourly rates previously have been determined to be reasonable in other FOIA actions. *See, e.g.*, *Public.Resource.org v. IRS*, 2015 WL 9987018, at *6 (N.D. Cal. Nov. 20, 2015) (awarding DWT's actual billing rates in FOIA litigation).

Burt Braverman has more than 50 years of litigation experience, including in FOIA cases. He regularly represents plaintiffs in FOIA litigation and has successfully obtained favorable fees reimbursement in those actions. In addition, he wrote the nation's first and authoritative two

volume FOIA treatise, a second book, as well as numerous law review articles on FOIA; has testified as an expert witness in Congress on FOIA issues; has helped draft FOIA legislation; has lectured around the world on FOIA issues; and has consulted with government officials from several countries on FOIA matters.  Braverman Decl. ¶ 20.

Thomas Burke has over 30 years of media and First Amendment litigation experience.  He has litigated numerous FOIA lawsuits in courts around the country, and has successfully obtained fee awards in FOIA actions based on his hourly billing rates.  *Id.*

Meenakshi Krishnan has five years of FOIA experience, and has been involved in numerous cases successfully obtaining records released under FOIA as well as favorable fee results.  *Id.*

Further, the rates for Plaintiffs' attorneys on which this fee request is based are supported by the rates presented in the LSI *Laffey* Matrix.  Braverman Decl. ¶¶ 27-28.

Therefore, the rates billed by Plaintiffs' counsel are reasonable.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs are entitled to and eligible for a fee award under FOIA. Plaintiffs therefore respectfully request that this Court award them $224,339.50 in attorneys' fees and $402 in costs, for a total of $224,741.50.


Dated: October 13, 2023                    Respectfully submitted,

                                           By:    */s/ Meenakshi Krishnan*
                                                  Meenakshi Krishnan (DC Bar No. 1617229)
                                                  Burt Braverman (DC Bar No. 178376)
                                                  DAVIS WRIGHT TREMAINE LLP
                                                  1301 K Street, NW
                                                  Suite 500 East
                                                  Washington, D.C. 20005
                                                  (202) 973-4200

burtbraverman@dwt.com
meenakshikrishnan@dwt.com

Thomas R. Burke
Davis Wright Tremaine LLP
50 California Street, Suite 2300
San Francisco, CA 94111
415-276-6552
thomasburke@dwt.com


*Counsel for Plaintiffs*