**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FIRST LOOK INSTITUTE, INC., et al.,

     Plaintiffs,

     v.

U.S. AGENCY FOR GLOBAL MEDIA,

     Defendant.

Civil Action No. 20-3499 (TJK)

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR AWARD OF ATTORNEYS' FEES AND COSTS**

Burt Braverman (DC Bar No. 178376)
Meenakshi Krishnan (DC Bar No. 1617229)
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW, Suite 500 East
Washington, DC 20005
202-973-4200
burtbraverman@dwt.com
meenakshikrishnan@dwt.com

Thomas R. Burke
Davis Wright Tremaine LLP
50 California Street, Suite 2300
San Francisco, CA 94111
415-276-6552
thomasburke@dwt.com


*Counsel for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

**Page**

I.    PLAINTIFFS ARE ELIGIBLE TO RECOVER ATTORNEYS' FEES AND COSTS......1

II.   PLAINTIFFS ARE ENTITLED TO RECOVER THEIR ATTORNEYS' FEES AND
      COSTS ................................................................................................................9

      A.    Plaintiffs Sought the Requested Records Solely To Inform the Public and
            Not For Commercial Benefit ................................................................... 9

            1.    December 2020 Lawsuit Filing................................................. 10

            2.    April 2021 Narrowing.............................................................. 11

            3.    May 2023 Decision Not to Pursue Summary Judgment........................... 12

      B.    USAGM Had No Reasonable Basis For Not Disclosing the Requested
            Records Until After Plaintiffs Filed Suit ............................................. 18

III.  PLAINTIFFS' REQUESTED FEES AND COSTS ARE REASONABLE....................21

      A.    The Hourly Rates Charged Are Reasonable ....................................... 22

      B.    The Number of Hours Expended is Reasonable ................................. 23

IV.   CONCLUSION................................................................................................25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Am. Ctr. for L. & Just. v. U.S. Dep't of State*,
  289 F. Supp. 3d 81 (D.D.C. 2018) ........................................................................19

*Am. Immigr. Council v. DHS*,
  82 F. Supp. 3d 396 (D.D.C. 2015) ......................................................................4, 5

*AquAlliance v. Nat'l Oceanic & Atmospheric Admin.*,
  2019 WL 2451687 (D.D.C. June 12, 2019) ..........................................................19

*Bigwood v. Def. Intel. Agency*,
  770 F. Supp. 2d 315 (D.D.C. 2011) ........................................................................5

*Calypso Cargo Ltd. v. U.S. Coast Guard*,
  850 F. Supp. 2d 1 (D.D.C. 2011), *aff'd*, 2012 WL 10236551 (D.C. Cir. Nov. 1, 2012) ...........5

*Codrea v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
  272 F. Supp. 3d 49 (D.D.C. 2017) ..........................................................................5

*Coffey v. Bureau of Land Mgmt.*,
  316 F. Supp. 3d 168 (D.D.C. 2018) ......................................................................25

*Democracy Forward Found. v. DOJ*,
  354 F. Supp. 3d 55 (D.D.C. 2018) ........................................................................20

*Dorsen v. SEC*,
  15 F. Supp. 3d 112 (D.D.C. 2014) ..........................................................................6

*Edelman v. SEC*,
  356 F. Supp. 3d 97 (D.D.C. 2019) ....................................................................8, 20

*Env't Def. Fund v. EPA*,
  2022 WL 136792 (D.D.C. Jan. 13, 2022) ...................................................... *passim*

*Env't Integrity Project v. EPA*,
  316 F. Supp. 3d 320 (D.D.C. 2018) ........................................................................9

*Env't Integrity Project v. Gen. Servs. Admin.*,
  2021 WL 3464337 (D.D.C. Aug. 6, 2021) ..............................................................8

*EPIC v. DHS*,
  218 F. Supp. 3d 27 (D.D.C. 2016) ..............................................................6, 19, 22

*EPIC v. DHS*,
    811 F. Supp. 2d 216 (D.D.C. 2011) .................................................................7, 23

*EPIC v. DHS*,
    999 F. Supp. 2d 61 (D.D.C. 2013) ...........................................................................9

*EPIC v. FBI*,
    72 F. Supp. 3d 338 (D.D.C. 2014) .........................................................................24

*EPIC v. IRS*,
    2023 WL 4892712 (D.D.C. June 2, 2023) ..............................................................22

*Fox v. Vice*,
    563 U.S. 826 (2011) ...............................................................................................25

*Hall & Assocs. v. EPA*,
    2023 WL 7928765 (D.D.C. Nov. 16, 2023) ......................................................13, 14

*Hartman v. Pompeo*,
    2020 WL 6445873 (D.D.C. Nov. 3, 2020) ..............................................................22

*Kwoka v. IRS*,
    989 F.3d 1058 (D.C. Cir. 2021) ...................................................................9, 15, 16

*Laffey. J.T. v. District of Columbia*,
    652 F. Supp. 3d 11 (D.D.C. 2023) ....................................................................22, 23

*Leopold v. U.S. Dep't of Just.*,
    2023 WL 1875229 (D.D.C. Jan. 26, 2023) .............................................................15

*Mattachine Soc'y of Washington, D*C v. *U.S. Dep't of Just.*,
    406 F. Supp. 3d 64 (D.D.C. 2019) ..........................................................................22

*Morley v. CIA*,
    894 F.3d 389 (D.C. Cir. 2018) (per curiam) .......................................................9, 19

*Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*,
    675 F.2d 1319 (D.C. Cir. 1982) ..............................................................................23

*Nat'l Sec. Couns. v. CIA*,
    189 F. Supp. 3d 73 (D.D.C. 2016) ............................................................................2

*Reyes v. U.S. Nat'l Archives & Recs. Admin.*,
    356 F. Supp. 3d 155 (D.D.C. 2018) ........................................................................24

*SEC v. Am. Int'l Grp.*,
    712 F.3d 1 (D.C.Cir.2013) ......................................................................................17

*Sierra Club v. EPA,*
  2021 WL 7210058 (D.D.C. Mar. 31, 2021)..................................................5, 6

*Summers v. DOJ,*
  140 F.3d 1077 (D.C. Cir. 1998) ..............................................................21

*Terris, Pravlik & Millian, LLP v. Ctrs. for Medicare & Medicaid Servs.,*
  794 F. Supp. 2d 29 (D.D.C. 2011)............................................................7

*Turner v. USAGM,*
  502 F. Supp. 3d 333 (D.D.C. 2020) .........................................................11

*Urb. Air Initiative, Inc. v. EPA,*
  442 F. Supp. 3d 301 (D.D.C. 2020)...................................................18, 23

*WP Co. v. DHS,*
  2023 WL 1778196 (D.D.C. Feb. 6, 2023) ...................................17, 19, 25

*WP Co. v. U.S. Dep't of State,*
  506 F. Supp. 3d 11 (D.D.C. 2020)........................................................4, 6

*WP Co. v. U.S. Small Bus. Admin.,*
  514 F. Supp. 3d 267 (D.D.C. 2021)...................................................24, 25

*Zynovieva v. U.S. Dep't of State,*
  2023 WL 2755599 (D.D.C. Mar. 31, 2023)...........................................4, 8

**Federal Statutes**

5 U.S.C. § 552 (Freedom of Information Act).......................................*passim*

Defendant United States Agency for Global Media ("USAGM") has no valid basis to challenge Plaintiffs' motion for attorneys' fees and costs. Instead, USAGM largely devotes its opposition to purported administrative delays that neither excuse its non-responsiveness to Plaintiffs' FOIA request prior to this lawsuit nor justify its obstructionism once litigation commenced. Perhaps recognizing the substantive weakness of its arguments, USAGM devotes the rest of its opposition to a specious and irrelevant conspiracy theory: that the requested records from this case supposedly were sought solely for use in an unrelated series of EEOC actions handled by one of Plaintiffs' counsel. That groundless speculation has no factual basis, and in any event, USAGM does not explain how that theory has any bearing on the merits of this fees motion. Rather, this smokescreen should be seen for what it is: a misguided attempt to distract from the reality that USAGM is wrong on the facts and the law of this case.

Plaintiffs have demonstrated that they are both eligible for and entitled to fees, and that their attorneys' hours and rates are reasonable. Plaintiffs respectfully request that this Court award them their attorney's fees of $224,339.50, and $402 in costs, for a total of $224,741.50.

## I.    PLAINTIFFS ARE ELIGIBLE TO RECOVER ATTORNEYS' FEES AND COSTS

USAGM insists that Plaintiffs cannot prevail on the catalyst theory of fees eligibility because supposed "administrative delays" and FOIA "backlogs" purportedly excuse its failure to have responded, even nominally, to Plaintiffs' FOIA request, and therefore this litigation played no role in precipitating its disclosures. Opp. at 8-9. In reality, the unrebutted record is clear: USAGM took *no* action on Plaintiffs' FOIA request prior to this lawsuit; despite its claimed administrative delays, it suddenly initiated searches and produced documents *only after, and in response to,* the pressure of this lawsuit with the Court's awareness; and it produced thousands of pages of missing attachments *only after* Plaintiffs identified them in the context and course of the litigation. Plaintiffs have done far more than what is required to establish eligibility for fees.

1

USAGM crucially ignores that on the eligibility inquiry, an agency "cannot simply cite administrative burdens and thereby automatically avoid paying fees." *Env't Def. Fund v. EPA*, 2022 WL 136792, at *4 (D.D.C. Jan. 13, 2022).  After looking at the "circumstances surrounding disclosure," a court can readily conclude that a "causal nexus" exists between the "commencement of the lawsuit and an agency's disclosures," notwithstanding the "presence of administrative delays and burdens." *Id.*  Key to this inquiry is whether the agency took any actions *prior* to the lawsuit to process a plaintiff's FOIA request, and therefore whether a plaintiff could be reasonably confident that a response and/or documents would be forthcoming absent litigation. *Electr. Privacy Info Ctr.* ("*EPIC*") *v. FTC*, 2020 WL 3248983, at *5 (D.D.C. June 16, 2020) (courts should account for, among other factors, "whether the agency has been transparent; the nature of an agency's backlog; whether the agency began its search for records prior to the FOIA plaintiff filing suit, and the extent of the agency's delays").  The causation standard is "not particularly high," not least because absent access to the agency's "internal workings," a plaintiff is "hard pressed to prove that the actual reason the agency released documents was the plaintiff's FOIA suit." *Nat'l Sec. Couns. v. CIA*, 189 F. Supp. 3d 73, 79–80 (D.D.C. 2016).

USAGM primarily denies that this lawsuit was the catalyst for its disclosure of the requested records, instead pointing to administrative reasons for its non-production.  On this point, *Environmental Defense Fund* is instructive.  There, like USAGM here, the EPA pointed to an "unprecedented" increase in FOIA requests, an "under-resourced" office amid a presidential transition, and other administrative factors as the reason for its failure to begin processing documents prior to the commencement of litigation.  2022 WL 136792, at *4.  Yet the Court found the plaintiff was nonetheless eligible for fees on the catalyst theory by holistically

examining the circumstances leading to disclosure: the EPA missed the statutory 20-day determination deadline to respond to the FOIA requests; the EPA's initial communications with the plaintiff about its requests were "sporadic and nonsubstantive"; the agency did not "acknowledge any legal obligation to produce responsive records before the litigation commenced" and "never indicated in its pre-lawsuit communications that it would begin producing responsive records"; and it did not search for or generate any responsive records prior to the lawsuit. *Id.* Instead, "it was only after the litigation commenced that EPA finally indicated it would process and produce responsive records." *Id.* at *5. As the Court concluded, "[t]hat is a change in position by the agency, and it was catalyzed by the commencement of the lawsuit." *Id.*

Identical circumstances are present here. The record reflects—and USAGM does not dispute, in either its opposition or the McLaren declaration—that prior to this lawsuit, USAGM missed its statutory deadline to respond to Plaintiffs' FOIA request; it never responded to or acknowledged in writing the FOIA request; it never acknowledged any legal obligation to produce responsive records before the litigation commenced; it never indicated to Plaintiffs that it had begun or would begin processing the request, initiating searches, or reviewing documents; and it never offered Plaintiffs any assurance that it even intended to produce documents, let alone provided a production date or produced any documents. Despite numerous outreach attempts by Plaintiffs, the *only* communication that Plaintiffs received between submitting their FOIA request and filing this lawsuit was a November 19 call from the USAGM FOIA liaison stating that the request had been received, and nothing more, with USAGM's ensuing silence the equivalent of telling Plaintiffs to pound sand. Mot. at 5 n.2. Given this non-responsiveness, USAGM provides no basis for its conclusory, *post hoc* assertion that it "plainly intended to

process Plaintiffs' request," Opp. at 9, when it purportedly intended to do so, or how Plaintiffs could possibly have deduced that from the agency's nearly two-month silence. Instead, it was "plainly reasonable for Plaintiff[s] to conclude at that point" that no documents would be released "absent judicial involvement," and certainly not on a timely schedule. *Am. Immigr. Council v. DHS*, 82 F. Supp. 3d 396, 403 (D.D.C. 2015). And just as in *Environmental Defense Fund*, only after litigation began did USAGM "finally indicate[] it would process and produce responsive records." 2022 WL 136792, at *5.

Indeed, where courts find plaintiffs ineligible for fees under the catalyst theory (including several cases cited by USAGM), they do so only where the agency made progress on the request and so informed the plaintiff *prior* to the lawsuit. For example, in *Grand Canyon Trust*, "well before" the complaint was filed, the agencies had made clear that they would "comply with the request", given the plaintiff their "predictions" as to when production would be completed, begun processing the plaintiff's request, and even made partial releases. *Grand Canyon Tr.*, 947 F.3d at 97. In *Zynovieva*, the agency had an "avowed policy of releasing the kinds of documents" sought by the plaintiff as a "matter of course," thus providing the plaintiff with certain indication that the agency would have "released [the] documents to [plaintiff] in due course, even if she had never brought suit." *Zynovieva v. U.S. Dep't of State*, 2023 WL 2755599, at *5, 7 (D.D.C. Mar. 31, 2023). Likewise, in many other instances where the catalyst theory was rejected, it was because the record showed that the agency had begun diligently running searches, reviewing documents, and otherwise processing the FOIA request *before* the lawsuit, but due to record volume or other administrative reasons, the disclosures were not completed until *after* the lawsuit. *See, e.g.*, *WP Co. v. U.S. Dep't of State*, 506 F. Supp. 3d 11, 16-17 (D.D.C. 2020) (rejecting catalyst theory where agency had informed the plaintiff prior to the

lawsuit that the request would be "processed as quickly as possible"); *Calypso Cargo Ltd. v. U.S. Coast Guard*, 850 F. Supp. 2d 1, 5 (D.D.C. 2011) (no "causal nexus" between lawsuit and defendant's release of documents where agency had conducted multiple searches and several rounds of document review prior to commencement of suit), *aff'd*, 2012 WL 10236551 (D.C. Cir. Nov. 1, 2012); *Bigwood v. Def. Intel. Agency*, 770 F. Supp. 2d 315, 321 (D.D.C. 2011) (rejecting catalyst theory where "clear that the agency expended a considerable amount of time and effort processing the plaintiff's request prior to the filing of his lawsuit[.]").

Here, the facts "speak for themselves—and they do not speak in [USAGM's] favor." *Am. Immigr. Council*, 82 F. Supp. 3d at 403. USAGM provided *no* indication—either at the time, given its complete non-response to Plaintiffs' FOIA request, or now, based on McLaren's declaration—that USAGM had any intention of releasing the requested records prior to, and in the absence of, Plaintiffs' commencement of this lawsuit. *Sierra Club v. EPA*, 2021 WL 7210058, at *3 (D.D.C. Mar. 31, 2021) (finding fees eligibility under catalyst theory where "the record evidence that [the agency] intended to disclose some records before [the p]laintiff filed this action [was] weak"). USAGM states that there was "no way" it could have processed the request between October and December 2020, but provides no specific or detailed justification as to why it could not have done so, begun to have done so, or at a bare minimum informed Plaintiffs when it would begin to do so. Opp. at 8. In *Codrea*, on which USAGM heavily relies, the agency justified the administrative backlog leading to its inaction with far greater specificity than USAGM has done here, for example, pointing to the fact that at the time the request was submitted, the agency was "heavily involved" with the review and *Vaughn* index drafting of "approximately 20,000 pages" of documents, and shortly after was involved with a "high priority redaction project" that occupied the entirety of its FOIA staff for six weeks. *Codrea v. Bureau of*

*Alcohol, Tobacco, Firearms & Explosives*, 272 F. Supp. 3d 49, 55 (D.D.C. 2017) (emphasizing importance of "the sufficiency of the agency's explanation for production delays"). USAGM has not cited or sufficiently described any similarly highly burdensome or time-consuming projects, let alone provided a sufficient description of any such supposed projects.

Nor does USAGM state why it did not, and could not, at least provide Plaintiffs an update that it intended to produce records pre-lawsuit, which in all likelihood would have led to an early narrowing of the request. Instead, even as of its amended Answer to the complaint, USAGM stated that it "ha[d] not made a final determination regarding Plaintiffs' FOIA request," and it did not express any intent to produce documents. ECF No. 9 ¶¶ 5, 31; *see Sierra Club v. EPA*, 2021 WL 7210058, at *2 (D.D.C. Mar. 31, 2021) (rejecting agency's *post hoc* claim that it "would have produced" responsive records in part because "nowhere in its Answer did [the agency] indicate that it was prepared to produce records"). USAGM cites no case, because it cannot, that a "newly revealed" and purported "past intent to disclose records" defeats causation. *Sierra Club*, 2021 WL 7210058, at *3.

Further bolstering a finding of causation in this case is the fact that USAGM first produced documents within two months after the filing of this lawsuit. In addition to examining whether a lawsuit caused the disclosure of documents in the first place, courts also find the catalyst theory satisfied if the suit "caused the release [of documents] to occur substantially more quickly." *WP Co.*, 506 F. Supp. 3d at 18. A "sudden acceleration" in processing a FOIA request following a lawsuit also indicates that the suit "substantially caused the agency's compliance with FOIA." *EPIC v. DHS*, 218 F. Supp. 3d 27, 41 (D.D.C. 2016); *see also Dorsen v. SEC*, 15 F. Supp. 3d 112, 120 (D.D.C. 2014) (the "lawsuit did, in fact, prompt a speedier release of responsive records … as amply confirmed by the timing of the releases shortly after the initiation

of this lawsuit"); *Terris, Pravlik & Millian, LLP v. Ctrs. for Medicare & Medicaid Servs.*, 794 F. Supp. 2d 29, 38 (D.D.C. 2011) (acceleration in producing records following a lawsuit indicates that "despite the government's protestation, the filing of the lawsuit was the real reason for that acceleration"); *EPIC v. DHS*, 811 F. Supp. 2d 216, 232 (D.D.C. 2011) (finding plaintiff eligible for fees under catalyst theory where agency produced its first responsive disclosure within a month of lawsuit filing). USAGM's "sudden burst of alacrity" in processing Plaintiffs' FOIA request, despite its purported extensive administrative delays, can only be attributed to this litigation. *Terris*, 794 F. Supp. 2d at 38.

Finally, USAGM disingenuously claims that it committed a "minor oversight" by omitting **4,949** pages of missing attachments to its productions (nearly 40 percent of USAGM's total productions) that it supposedly was "always going to process." Opp. at 10-11. To the contrary, it was only after a painstaking review of all the produced records that Plaintiffs—not USAGM—discovered that USAGM had failed to produce a large quantity of email attachments, even though the agency previously represented directly to Plaintiffs' counsel and in its transmittal letters that its productions were substantially complete and accurate, and that responsive attachments to disclosed emails were produced "generally immediately after that document," except when an entire attachment was claimed to be exempt. *See* Mot. at 6. Then, instead of independently confirming whether its productions were complete, USAGM continued to insist that all attachments had been produced, and refused to search for or produce them until Plaintiffs' counsel specifically identified which email attachments were missing—a task that required Plaintiffs' counsel to meticulously review 7,714 pages of previously produced documents to identify the 4,949 pages of missing attachments. *Id.* Only many months later did USAGM belatedly admit that not all email attachments had been produced, contradicting its

prior repeated representations, and only after Plaintiffs repeatedly pressed the issue and did the agency's work of identifying the missing documents. *Id.* Far from a "minor oversight," USAGM obstructed and thwarted Plaintiffs' lawful access to these documents for many months. For this additional reason, Plaintiffs are eligible for fees. *Edelman v. SEC*, 356 F. Supp. 3d 97, 103 (D.D.C. 2019) (FOIA plaintiff is a prevailing party if they "succeed on any significant issue in litigation [that] achieves some of the benefit … sought in bringing the suit").

In sum, far from USAGM's bald claims that this lawsuit "made no difference" and was neither "necessary nor productive," the record makes clear that this lawsuit is a significant, if not the only, reason USAGM produced the requested documents, including the 4,949 pages of omitted attachments, and at the pace it ultimately did. Opp. at 12-13; *see Env't Integrity Project v. Gen. Servs. Admin.*, 2021 WL 3464337, at *7 n.2 (D.D.C. Aug. 6, 2021) (court "need not find that [plaintiff's] filing of the [] lawsuit was the *sole* reason" for production of documents to find eligibility; sufficient that lawsuit "substantially caused" agency to alter its position"). Plaintiffs' arguments are neither "purely temporal" nor speculative; instead, given USAGM's silence on the request, it was reasonable to believe (and the record has borne out) that judicial relief was the only way to procure these documents. *Zynovieva*, 2023 WL 2755599, at *7. Under USAGM's theory, a plaintiff would be required to endlessly wait for an agency to decide to respond to its requests before it could ever be eligible for fees. This would lead to perverse incentives at odds with FOIA, as "an agency could always avoid paying fees by providing occasional nonsubstantive updates without ever rendering a determination on a FOIA request, offering any indication whether it will process the request, or generating any responsive records." *Env't Def. Fund*, 2022 WL 136792, at *5. That would defeat the purpose of FOIA's fees provision, which

is intended to "reward plaintiffs whose lawsuits alter an agency's slowness and bring about disclosure." *Env't Integrity Project v. EPA*, 316 F. Supp. 3d 320, 325 (D.D.C. 2018).

## II.    PLAINTIFFS ARE ENTITLED TO RECOVER THEIR ATTORNEYS' FEES AND COSTS

USAGM concedes, as it must, that the public interest factor weighs in Plaintiffs' favor on the issue of entitlement.  Opp. at 13.  But USAGM disputes the remaining three factors, specifically the "commercial benefit to the plaintiff," "the nature of the plaintiff's interest in the records," and "the reasonableness of the agency's withholding of the requested documents." *Morley v. CIA*, 894 F.3d 389, 391 (D.C. Cir. 2018) (per curiam).  Each of its arguments fails.

### A.    Plaintiffs Sought the Requested Records Solely To Inform the Public and Not For Commercial Benefit

The second and third factors presumptively favor non-profit and journalistic organizations that "aim to ferret out and make public worthwhile, previously unknown government information" because it is "precisely the activity that FOIA's fees provision seeks to promote."  *EPIC v. DHS,* 999 F. Supp. 2d 61, 69 (D.D.C. 2013) (citation omitted); *see also Kwoka v. IRS*, 989 F.3d 1058, 1064 (D.C. Cir. 2021) ("[T]he second and third factors 'generally' should weigh in favor of scholars and journalists unless their interest 'was of a frivolous or purely commercial nature.'") (citation omitted).  USAGM's *only* argument for why Plaintiffs do not satisfy the second and third factors is a conspiracy theory that they have concocted out of whole cloth.  This argument should be flatly rejected.

Without any actual evidence, USAGM "disputes" whether Plaintiffs' journalistic motive was the "true motive" for these requests. Instead, USAGM speculates that Plaintiffs' counsel pursued this litigation solely to further EEOC claims litigated by one of Plaintiffs' counsel on behalf of foreign-national journalists who were purged by USAGM's CEO, Michael Pack, from their positions at Voice of America ("VOA") as part of a broader effort to politicize VOA.  Opp.

at 19.  The only support that USAGM musters for this theory is a series of three coincidental dates: Plaintiffs' filing of this FOIA suit on December 1, 2020, on the same day that formal complaints were filed in three of the nine EEOC cases; Plaintiffs' request, in April 2021, that USAGM focus its searches on certain categories of documents; and in May 2023, after the EEOC cases had a settlement agreement in principle, Plaintiffs' notification to USAGM that it did not intend to pursue summary judgment challenges to the scope of USAGM's search and the extent of its redactions.  Opp. at 14-16.  Each of these has an obvious explanation that topples USAGM's house of cards.

### 1.    *December 2020 Lawsuit Filing*

*First*, it is purely coincidental that Plaintiffs filed this FOIA suit on the same day that formal complaints were filed in three of the nine EEOC cases, but this timing is unsurprising as they both came on the heels of, and were directly related to, Mr. Pack's months-long xenophobic campaign to clean house of foreign journalists, and others, at VOA.  Supplemental Declaration of Burt Braverman ("Braverman Suppl. Decl.") ¶¶ 4-5.  USAGM conveniently ignores that the journalists' EEOC claims and this lawsuit were both part of broad public scrutiny of Pack's actions and their connection to the White House, President Trump, and his then-counselor and strategist Stephen Bannon, that crescendoed in late 2020 toward the end of Mr. Pack's tenure and included a spate of USAGM-related litigation, national and international press coverage, and congressional and governmental oversight, heightened attention that USAGM itself acknowledges (Opp. at 6).[1]  For example, on November 20, 2020 (11 days prior to this suit), the

---

[1] *E.g.*, *Turner v. USAGM*, No. 1:20-cv-02885 (D.D.C. filed Oct. 8, 2020) (lawsuit filed against Pack and his leadership team by USAGM employees); Letter from Senate Committee on Foreign Relations to Michael Pack (Sept. 14, 2020), https://www.foreign.senate.gov/imo/media/doc/09-14-20%20Letter%20to%20Pack%20on%20Visa%20ExtensionsFINAL1.pdf; "FOIA to USAGM Seeking Communications of Michael Pack and Senior Officials," American Oversight (Oct. 9, 2020), https://www.americanoversight.org/document/foia-to-usagm-seeking-communications-of-michael-pack-and-senior-officials; Brian Schwartz, "Trump loyalist Michael Pack plots final purge at federal media agency before Biden

District of Columbia federal court granted a preliminary injunction to the *Turner v. USAGM* plaintiffs, ordering Mr. Pack and his team to stop investigating and interfering with journalists employed at VOA.  502 F. Supp. 3d 333 (D.D.C. 2020).  Then President-Elect Biden's transition team met with former USAGM leaders in late November 2020 to discuss the events that had befallen USAGM under Mr. Pack's tenure and to follow through on Biden's promise to remove Mr. Pack from his position.[2]  Indeed, the very day after this lawsuit was filed, the Office of Special Counsel found a "substantial likelihood" that whistleblower information disclosed that Pack and his leadership had engaged in "a violation of law, rule, or regulation, an abuse of authority, and gross mismanagement," including as to the denial of J-1 visas to VOA foreign journalists.[3]  As such, the coincidence of dates reflects nothing more than the collective increase, in the waning days of Mr. Pack's tenure and the Trump Administration, in public scrutiny of, and efforts by affected and concerned parties to seek accountability for, Mr. Pack's actions.

## 2. *April 2021 Narrowing*

*Second*, as to the April 2021 narrowing of Plaintiffs' FOIA requests, that timing was dictated by USAGM's delays and the months-long back-and-forth between Plaintiffs and USAGM, not the VOA journalists' cases.  As the emails attached by USAGM to its Opposition make clear, this narrowing followed extensive negotiations between Plaintiffs' and USAGM's counsel regarding the scope of the potentially responsive document set.  *See* Dkt. No. 41-2.  For

---

takes office," CNBC (Dec. 7, 2020), https://www.cnbc.com/2020/12/07/trump-federal-media-agency-ceo-plots-final-purge-before-biden-arrives.html;  Paul Farhi, "Trump appointee who oversees Voice of America refuses to cooperate    with    Biden    transition    team,"    Wash.    Post    (Dec.    8,    2020), https://www.washingtonpost.com/lifestyle/media/michael-pack-voice-america-biden-transition/2020/12/08/8212f630-38e7-11eb-9276-ae0ca72729be_story.html.

[2] Brian Schwartz, "Biden team meets with former U.S. media agency leaders, including some ousted by Trump appointee," CNBC (Nov. 25, 2020), https://www.cnbc.com/2020/11/25/biden-transition-meets-with-former-media-agency-leaders-ousted-by-trump-appointee.html.

[3]    Letter    from    U.S.    Office    of    Special    Counsel    to    Michael    Pack    (Dec.    2,    2020), https://osc.gov/Documents/Public%20Files/FY23/DI-20-1086/Redacted%20OSC%201213(c)%20Referral%20DI-20-1086%20et%20al..pdf.

example, on March 26, 2021, after several calls and email discussions, Plaintiffs agreed to narrow the scope of their requests to eight categories of records solely in order to expedite the production of records. *See* email from M. Krishnan, Dkt. No. 41-2 at 10-11. Then, after agency counsel stated on March 31, 2021 that she could only do "custodian-specific searches," and following further meet and confers between counsel, *see* email from K. Molen, Dkt. No. 41-2 at 9, Plaintiffs ultimately agreed on April 20, 2021to a narrowed custodian-by-custodian search, *see* email from M. Krishnan, Dkt. No. 41-2 at 1-2. The focus on "J-1 visas" was twofold: because that was one of Pack's most intensely scrutinized and criticized actions,[4] and at the core of Plaintiffs' FOIA request, and because USAGM informed Plaintiffs that it could easily run those search terms without yielding false hits and artificially inflating the production. Braverman Suppl. Decl. ¶ 8. Accordingly, rather than having any connection with the unrelated EEOC cases, this narrowing was the product both of Plaintiffs' realistic assessment of USAGM's search completion time, and USAGM's *own* specifications and suggestions as to how to shorten the time for completing the search and review process.

### 3. *May 2023 Decision Not to Pursue Summary Judgment*

*Third*, USAGM claims that the EEOC cases' settlement in principle by May 1, 2023, and Plaintiffs' decision not to pursue summary judgment challenges on May 5, 2023, were linked. Again, this is nothing more than unfounded speculation based purely on coincidence in dates, when in reality the two had nothing to do with one another. Braverman Suppl. Decl. ¶¶ 9-11. Indeed, Plaintiffs' decision to not pursue summary judgment challenges followed *months* of

---

[4] *See, e.g.*, "Lawmakers criticize Trump administration changes at US-funded media networks," VOA (Sept. 24, 2020), https://www.voanews.com/a/usa_us-politics_lawmakers-criticize-trump-administration-changes-us-funded-media-networks/6196338.html; "Voice of America visa review could put journalists at risk," Committee to Protect Journalists (July 13, 2020), https://cpj.org/2020/07/voice-of-america-visa-review-could-put-journalists-at-risk/; Pranshu Verma & Edward Wong, "Trump Appointee Might Not Extend Visas for Foreign Journalists at V.O.A.," N.Y. Times (July 9, 2020), https://www.nytimes.com/2020/07/09/us/politics/voice-of-america-visas-michael-pack.html.

consideration and analysis of nearly 13,000 pages of produced but redacted documents, which could only take place following USAGM's belated completion of its production of the 4,949 pages of missing attachments on October 28, 2022.  *Id.* ¶ 10.  After conducting that analysis, Plaintiffs concluded that the documents produced contained sufficient information to show, among other things, that (1) Mr. Pack and his leadership team delayed renewal of the foreign journalists' J-1 visas without any justification; (2) VOA's professional staff repeatedly implored Mr. Pack and USAGM senior officials to renew those visas, lest they cause great harm to VOA's broadcast services; (3) Mr. Pack and USAGM senior officials regularly coordinated with the White House regarding the J-1 visa controversy; (4) Mr. Pack and his staff, in concert with the White House, sought to develop a rationale to support their vendetta against the foreign journalists; and (5) Mr. Pack and his leadership investigated their own agency at huge and wasteful taxpayer expense.  *See* Mot. at 10-11; Susman Decl. ¶¶ 10-16, Dkt. No. 40-5.  Given these revelations, Plaintiffs did not believe it was necessary or warranted to expend substantial additional resources—either Plaintiffs', USAGM's or the Court's—over what undoubtedly would have been many months, if not years, to litigate search and redaction issues, including likely appeals.  That decision, and its timing, had nothing to do with the EEOC cases. Braverman Suppl. Decl. ¶¶ 9-11.

In short, there is absolutely no truth to USAGM's unfounded claim that Plaintiffs' counsel "us[ed] the documents produced from this FOIA request to litigate the discrimination and breach of contract cases before the EEOC and Court of Federal Claims." (Opp. at 16); Braverman Suppl. Decl. ¶ 11.  The documents obtained in this case were not used in any manner in the EEOC or CFC cases; indeed, glaringly, USAGM does not, and cannot, point to a single instance of any such alleged use.  *Id.* ¶ 7.

Nor is there any "double recovery" of fees. The Plaintiffs in this case and the plaintiffs in the EEOC cases are unrelated, and the case cited by USAGM, *Hall*, is amply distinguishable. In *Hall*, the plaintiff-requestor, a private law firm, submitted FOIA requests tailored to its clients' interests as regulated entities engaged in wastewater treatment. *Hall & Assocs. v. EPA*, 2023 WL 7928765, at *13 (D.D.C. Nov. 16, 2023). Here, USAGM cannot contest that Plaintiff Lee Fang, a journalist, submitted a FOIA request on his and *The Intercept*'s behalf as a direct "part of [his] news gathering" to inform the public, and that none of the EEOC plaintiffs was involved in that effort or this litigation, or vice versa. *See* Dkt. 1-1. Nor can USAGM rebut that numerous other parties—ranging from journalists to congressional representatives to personally affected and private interests—also took deep interest in Mr. Pack's J-1 visa decisions in this same period.[5] Braverman Suppl. Decl. ¶ 3. USAGM's suggestion that an overlap in the subject matter of the documents sought in this litigation and the subject of the journalists' cases signifies that this lawsuit was some kind of front for the EEOC actions is patently absurd. Taking USAGM's position to its logical end, FOIA counsel could never recover fees for litigating FOIA requests in a subject area in which they also happen to be representing other clients.

Plaintiffs *The Intercept* and Lee Fang sought the documents at issue here solely for purposes of investigating Pack's and USAGM's conduct regarding the termination of foreign journalists at USAGM on pretextual and xenophobic grounds, the role of the Trump Administration in that effort, and the broader mission to politicize Voice of America, a story that numerous other national news outlets, including *The New York Times, NPR* and *The Washington Post,* also were covering. If the journalists had wanted to obtain the documents at issue in this

---

[5] *See, e.g.*, David Folkenflik, "Foreign Journalists Working for U.S. Government Broadcasters May Lose Visas," NPR (July 10, 2020), https://www.npr.org/2020/07/09/889301025/u-s-broadcasting-agency-will-not-extend-visas-for-its-foreign-journalists; David Folkenflik, "Trump Official Cited Security To Kill Visas For VOA Staffers. Emails Say Otherwise" (Feb. 11, 2021), https://www.npr.org/2021/02/11/966386113/trump-official-cited-security-to-kill-visas-for-voa-staffers-emails-say-otherwis.

FOIA litigation for use in their cases, they simply could have requested them under FOIA or sought them in discovery; they didn't need Plaintiffs to serve as a stalking horse to do it for them. Braverman Suppl. Decl. ¶ 7.  The fees paid by USAGM in the journalists' cases reflected three years of litigation of eight EEO discrimination cases and eight CDA breach of contract cases, including approximately 35 mediation sessions, some lasting all day, and were paid following Plaintiffs' provision to USAGM of detailed billing records.  *Id.* ¶ 6.  If USAGM truly believed that the attorney fees it paid in the journalists' EEOC litigation were supposed to cover fees in this case as well, no doubt it and its experienced counsel would have provided as such in the settlement agreements in those cases.  They did not, reflecting that the fees recovered in those cases have no relevance or preclusive effect here. *Id.* ¶¶ 7, 11.

USAGM next appears to suggest that it prevails on the third and fourth factors because *The Intercept* has not yet published an article reporting on the disclosed records.  Opp. at 17-18. While Plaintiffs do not dispute that *The Intercept* has not yet done so, that has no bearing on these factors.  In fact, USAGM's position would turn these factors on their head, as FOIA does not mandate that a journalist publish based on the responsive records prior to a fees motion in order to be entitled to fees.  Instead, these factors simply evaluate the plaintiff's "objectives" and "interests" in the records, and whether they are "public-minded and journalistic."  *Leopold v. U.S. Dep't of Just.*, 2023 WL 1875229, at *6 (D.D.C. Jan. 26, 2023), *R. & R. adopted,* 2023 WL 1875209 (D.D.C. Feb. 10, 2023).  For this reason, courts regularly find FOIA scholar- or journalist-plaintiffs entitled to fees even when they have not yet published a work based on the records.  *See, e.g.*, *Kwoka*, 989 F.3d at 1065 (finding plaintiff entitled to fees where she stated her intention to "publish a  book . . . featuring her analysis of the very information she obtained"); *Leopold*, 2023 WL 1875229, at *6 & *id.*, No. 1:21-cv-00942, ECF No. 27-1 (finding

plaintiff entitled to fees where declaration stated that he "*would*" report the news based "at least in part" on the requested information and that the records would more generally inform his reporting on the topic). FOIA recognizes the well-established journalistic premise that public records have a broader utility than any immediate publication of their contents; such records can and do inform an outlet's reporting, and the public, in the long-term. This is especially true for investigative reporting like that of *The Intercept*, which frequently relies on primary sources, like public records, that may take months, if not years, to assemble. *See* Bralow Decl. ¶¶ 6-7, 10; Supplemental Declaration of David Bralow ("Bralow Suppl. Decl.") ¶ 7.

That alone is enough to overcome USAGM's arguments on these factors. But specific to this case, USAGM's failure to timely produce these records in full until October 2022, as well as several recent administrative and personnel developments at *The Intercept*, explain the delay in publication of a story related to these records. First, USAGM's years-long delay in producing responsive documents meant that the news cycle had largely moved on from Mr. Pack by the time productions were complete in October 2022 and Plaintiffs' completed their review and analysis of those records in 2023. Second, in early 2023, *The Intercept* was spun off into a standalone nonprofit organization that entailed a decision to part with some of the newsroom's personnel, later followed by the appointment of new leadership.[6] Bralow Suppl. Decl. ¶¶ 3-4. Third, Plaintiff Lee Fang, *The Intercept* reporter who submitted the underlying FOIA request on behalf of himself and *The Intercept*, left the publication in March 2023. *Id.* ¶ 5.[7] All of these factors, taken together, have delayed *The Intercept*'s ability to publish a story on the case to date.

---

[6] "The Intercept Announces Restructuring As Independent Nonprofit Organization," Intercept (Jan. 9, 2023), https://theintercept.com/2023/01/09/intercept-restructuring-nonprofit/; *see also* Sara Fischer, "Exclusive: The Intercept spinning off as an independent nonprofit," Axios (Jan. 9, 2023), https://www.axios.com/2023/01/09/the-intercept-spinoff-independent-nonprofit; "The Intercept Appoints Inaugural CEO and Announces New Board of Directors," Intercept (Mar. 14, 2023), https://theintercept.com/2023/03/14/intercept-ceo-board-of-directors/.

[7] *See also* @lhfang, X (Apr. 11, 2023), https://twitter.com/lhfang/status/1645866286797438981 ("I left The Intercept last month. I am going to devote my time primarily to Substack.").

But FOIA accounts for these variables; again, that is why these factors look to a requestor's *intentions*, not just their publication record.  *Kwoka*, 989 F.3d at 1065.

With last year's transitions now behind it, *The Intercept* assigned politics reporter, Prem Thakker, to review the documents and potentially pursue a story anew.  Bralow Suppl. Decl. ¶ 6.  Mr. Thakker reports on political and corporate corruption, labor and justice, among other subjects.[8]  With *The Intercept*'s record of reporting on USAGM and Mr. Pack, *see* Mot. at 3; Bralow Decl. ¶ 4, and with former President Trump leading the polls,[9] these records will have new relevance and help to refocus public attention on the events that transpired under Mr. Pack's, and the Trump Administration's, directions and what might happen if former President Trump is reelected.  In that regard, just last year, USAGM itself issued a 145-page report on Mr. Pack's tenure, finding that Mr. Pack repeatedly abused his authority.[10]  Thus, even if *The Intercept* were to decide not to publish a story specifically on the 2020 Pack saga, the records obtained will inevitably inform its reporting—and the public—on former President Trump's playbook, the agency's management, and the threat to independent journalism in general, and foreign journalists in particular, if he were to return to office.  *See SEC v. Am. Int'l Grp.*, 712 F.3d 1, 3 (D.C.Cir.2013) (FOIA serves public's "fundamental interest in keeping a watchful eye on the workings of public agencies.") (citation omitted).

In short, like other successful FOIA fees plaintiffs, these requests "fit squarely with [*The Intercept*'s] public reporting about [USAGM and Mr. Pack] during the Trump administration."[11]  *WP Co. v. DHS*, 2023 WL 1778196, at *3 (D.D.C. Feb. 6, 2023).  Notwithstanding USAGM's

---

[8] "Prem Thakker," Intercept, https://theintercept.com/staff/premthakker/.
[9] Katherine Fung, "Donald Trump's Massive Victory if Election Were Held Today," Newsweek (Jan. 4, 2024), https://www.newsweek.com/donald-trump-win-election-joe-biden-1857100.
[10] "Review of Management Actions: June 2020-January 2021," USAGM (Feb. 2023), https://osc.gov/Documents/Public%20Files/FY23/DI-20-1086/Redacted%20Agency%20Report%20of%20Investigation%20DI-20-1086%20et%20al..pdf.
[11] *See, e.g.*, Alex Emmons, "Trump Appointee to VOA Reporters: Criticizing Trump is a Conflict of Interest," Intercept (Oct. 5, 2020), https://theintercept.com/2020/10/05/voa-reporters-conflict-of-interest-memo/.

attempt to utilize several unconnected dates to distract from the obvious conclusion that Plaintiffs satisfy the second and third factors, Plaintiffs undoubtedly clear the bar.

> **B.      USAGM Had No Reasonable Basis For Not Disclosing the Requested Records Until After Plaintiffs Filed Suit**

On the fourth factor, USAGM again relies on supposed administrative delays, conclusorily and repeatedly stating as a factual matter that its "actions were reasonable," indeed "commendable," and *post hoc* claiming that it "always" "intended to process Plaintiffs' request; [but was] just delayed because of the unforeseen increase in requests." Opp. at 8, 10, 11, 18-20. But just saying it doesn't make it so, and none of these arguments constitutes a reasonable basis for failing to disclose the requested records until after Plaintiffs filed suit.

Fundamentally, USAGM ignores that courts in this District have repeatedly held that "administrative delay and FOIA backlog do not form a 'reasonable basis in law' for withholding documents" because the purpose of the fourth factor—to "incentivize the government to promptly turn over[,] before litigation is required[,] any documents that it ought not withhold"— "would not be served if it were reasonable for agencies to withhold documents for indeterminant periods of time because they have too many FOIA requests and too few FOIA staff members." *Env't Def. Fund*, 2022 WL 136792, at \*6 (citations omitted and cleaned up); *Urb. Air Initiative, Inc. v. EPA*, 442 F. Supp. 3d 301, 319 (D.D.C. 2020) (same). More specifically, USAGM ignores the unreasonable positions it adopted pre- and post-litigation.

*First*, USAGM acted unreasonably by failing to produce any responsive, non-exempt documents in the two months before litigation, or even to engage in any reasonable communication with Plaintiffs about the request and USAGM's intentions regarding processing the request. Instead, it now belatedly claims that its silence was justified by administrative delay, and that it always intended to disclose the requested documents. But in *Environmental Defense*

*Fund*, although the court acknowledged the agency's attribution of the delay to "administrative burdens," it ultimately found those burdens alone did not justify the withholding.  2022 WL 136792, at *6.  There, like here, the agency did not evince *any* intent to respond to the plaintiff's FOIA request prior to the lawsuit.  *Id.*  As USAGM concedes, at most, it orally stated to Plaintiff Fang that it had received the request, but said and did nothing else in response to Plaintiffs' several requests about status.  Opp. at 19-20.  Such silence "before the start of this litigation evinces listlessness, not reasonableness," and is exactly the "type of conduct Congress thought warranted … fees."  *Env't Def. Fund*, 2022 WL 136792, at *6; *see also EPIC,* 218 F. Supp. 3d at 46 (this factor "favor[s] [plaintiff]" where agency "failed to respond in any meaningful way to [plaintiff's] FOIA request prior to the initiation of this lawsuit").  Indeed, in this case, Plaintiffs certainly have "show[n] more than the fact of a pre-suit delay to establish that[USAGM] acted unreasonably in response to a FOIA request."  *AquAlliance v. Nat'l Oceanic & Atmospheric Admin.*, 2019 WL 2451687, at *5 (D.D.C. June 12, 2019).

*Second*, even accepting USAGM's invocation of administrative delays, its position is still untenable and its cases highly distinguishable.  Courts have made clear that administrative burdens do not constitute a "reasonable basis in law" to delay disclosure for purposes of overcoming this factor; at most, they amount to an explanation that "as a factual matter, they behaved reasonably under the circumstances."  *WP Co. v.* 2023 WL 1778196, at *3  (concluding that such an explanation does not favor an agency).  In any event, even considering USAGM's explanation, it still fails muster.  As to administrative backlog, USAGM did not face a backlog anywhere approximating the "1,675" total requests and "940" requests in the same queue as the agency in *Morley*, let alone the substantially larger agency backlogs excused by courts in other cases.  *Morley*, 894 F.3d at 393; *see also Am. Ctr. for L. & Just. v. U.S. Dep't of State*, 289 F.

Supp. 3d 81, 88 (D.D.C. 2018) (excusing delay when agency had backlog of "24,210" pending requests). Instead, by USAGM's own admission, it received only <u>60</u> requests between June and December 2020, the operative period for Plaintiff's October 2020 request. Opp. at 1. USAGM offers no explanation in its Opposition or McLaren declaration as to why, even accepting that its FOIA load increased in light of Mr. Pack's actions, the agency made no efforts to hire additional personnel or dedicate increased FOIA resources to the higher number of requests. *Cf. Democracy Forward Found. v. DOJ*, 354 F. Supp. 3d 55, 59 (D.D.C. 2018) (even a "large backlog" not sufficient to justify delay; instead, the number of requests must be "truly unforeseen and remarkable"). Indeed, Plaintiffs repeatedly and unsuccessfully asked USAGM this question in several joint status reports in this litigation. *See, e.g.*, October 29, 2021 Joint Status Report, Dkt. No. 23 ("USAGM has had nearly 11 months since this action was initiated to hire replacement personnel, yet the agency still has failed to take the administrative actions needed to enable it to meet its obligations under FOIA … Nor has agency counsel been able to provide any further information as to when USAGM expects to hire FOIA-related staff, despite having had nearly a year to do so in the face of repeatedly-asserted staffing constraints."); August 31, 2021 Joint Status Report, Dkt. No. 20; July 30, 2021 Joint Status Report, Dkt. No. 19; June 30, 2021 Joint Status Report, Dkt. No. 18 (similar).

Nor, unlike *Edelman*, did this request require any coordination with "various offices and divisions," which excused an agency's *nine-month* delay in producing documents in response to *six* separate requests. *Edelman*, 356 F. Supp. 3d at108. Here, USAGM took *over two years* to produce documents in response to a *single* request that required *no coordination* with any other department or agency. This delay was manifestly unreasonable, especially when compared with the cases USAGM relies upon.

Finally, USAGM acted unreasonably by not properly producing nearly 5,000 pages of email attachments, misrepresenting to Plaintiffs that they were in fact produced, and then forcing Plaintiffs to do the agency's work of identifying the missing attachments, a task far more difficult for Plaintiffs than it would have been for USAGM and that consumed approximately 30 hours of Plaintiffs' counsel's time. Plaintiffs have addressed at greater length above what USAGM remarkably characterizes as only a "minor oversight," but suffice to say that the issue was far from "minor" and was certainly not a mere "oversight." Instead, USAGM misrepresented the nature of its productions to Plaintiffs, and only after months of insistence and painstaking review of documents conducted by Plaintiffs did USAGM belatedly acknowledge that its prior productions were not complete. Braverman Decl. ¶ 8, Dkt. No. 40-2. USAGM cannot have it both ways: It cannot claim that due to administrative burdens, Plaintiffs were forced to perform the agency's duty of properly identifying and producing attachments while simultaneously claiming that Plaintiffs are not entitled to recover fees for the burdens involved in rectifying USAGM's slipshod production. USAGM's attempt to brush off dereliction of this magnitude as a minor oversight takes "unmitigated gall" and only further reinforces the unreasonableness of USAGM's position. *Summers v. DOJ*, 140 F.3d 1077, 1084 (D.C. Cir. 1998) (Silberman, J., concurring).

At bottom, USAGM's argument boils down to its apparent claim that it did the best it could. The record does not support that conclusion, and even if it did, it is not enough to sway the fourth factor in USAGM's favor. Like all the others, the fourth factor equally supports the conclusion that Plaintiffs are entitled to recover their reasonable attorneys' fees and costs.

## III.    PLAINTIFFS' REQUESTED FEES AND COSTS ARE REASONABLE

USAGM further asserts that, should this Court find that Plaintiffs are both eligible for and entitled to fees under FOIA, Plaintiffs' hourly rates and hours expended are unreasonable.

USAGM claims that Plaintiffs' number of hours should be reduced by at least 50%, and the hourly rates applied should be no higher than the rates provided in the *Fitzpatrick* Matrix.  Opp. at 31.  USAGM is wrong on both counts.

A.    **The Hourly Rates Charged Are Reasonable**

USAGM primarily disputes Plaintiffs' use of the LSI *Laffey* Matrix, claiming that the Court should instead use the lower rates found in the USAO *Fitzpatrick* matrix, which is published by DOJ itself.  *EPIC v. IRS*, 2023 WL 4892712, at *15 (D.D.C. June 2, 2023).  Although Plaintiffs do not dispute that some courts in this District have relied on the *Fitzpatrick* matrix, it is unequivocally false to say that courts in this District do not use the *Laffey* matrix.  In fact, a lively debate exists in this Circuit as to which matrix is appropriate, and many courts have recognized the "appropriateness of and greater accuracy of rates" in the *Laffey* matrix because it "better reflect[s] the actual costs of litigation."  *EPIC*, 218 F. Supp. 3d at 48 (citation omitted); *see also Hartman v. Pompeo*, 2020 WL 6445873, at *12 (D.D.C. Nov. 3, 2020) ("It is well established that the [*Fitzpatrick*] rates have failed to keep pace with the true rate of inflation, which is why '[w]hen the two [are] pitted against each other, courts frequently [find] the LSI *Laffey* matrix more persuasive.'") (citation omitted); *Mattachine Soc'y of Washington, D*C v. *U.S. Dep't of Just.*, 406 F. Supp. 64, 71 (D.D.C. 2019) (selecting LSI *Laffey* rates over USAO Matrix rates and criticizing the USAO Matrix for its "failure to survey the relevant population and canvass the relevant type of lawyer before imposing a specific hourly rate.") (citation omitted).  Courts have also found that the *Laffey* matrix is appropriate where, as here, the attorney's usual billing rates match those of *Laffey*.  *J.T. v. District of Columbia*, 652 F. Supp. 3d 11, 27 (D.D.C. 2023) (finding this element favors using *Laffey* as "prevailing market rate").

Contrary to USAGM's characterization, Plaintiffs submitted declarations from Brian Fanning, the Senior Director of Revenue and Profitability at the undersigned's firm, as well as

Thomas Susman, a nationally respected expert on FOIA litigation, stating that Plaintiffs'
counsel's rates were comparable to peer law firms based on "survey data compiled by the big
four accounting firms' surveys, the most recent of which is from June 2023,"[12] and that Mr.
Braverman, Mr. Burke, and Ms. Krishnan's billing rates were comparable to the median ranges
for their geographic peers.  Fanning Decl. ¶¶ 3-6, Dkt. No. 40-7; Susman Decl. ¶¶ 21-24; *see
also Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1325 (D.C. Cir. 1982)
(crediting "affidavits" explaining the "precise fees that attorneys with similar qualifications have
received from fee-paying clients in comparable cases" as indicative of "prevailing community
rate information").   Plaintiffs respectfully submit that the *Laffey* matrix should be applied here.

### B.    The Number of Hours Expended is Reasonable

Finally, USAGM claims that the number of hours expended by Plaintiffs' attorneys is
unreasonable, but overlooks the fact that the numerous obstructions and delays caused by
USAGM itself were the primary factors driving the amount of time spent by Plaintiffs' counsel.

USAGM's primary gripe relates to the number of hours spent on Plaintiffs' review of the
more than 12,000 pages of records produced in this case.  But as USAGM acknowledges,
document review is core to a FOIA lawsuit, because it is "necessary to evaluate the sufficiency
of production or to challenge withholdings." *Urb. Air Initiative*, 442 F. Supp. 3d at 325.  Indeed,
courts have found it "critical" to the prosecution of a FOIA lawsuit for plaintiffs to "review an
agency's disclosure for sufficiency and proper withholding during the course of its FOIA
litigation" and awarded fees related to that review.  *EPIC*,  811 F. Supp. 2d at 239-40; *see also
EPIC v. FBI*, 72 F. Supp. 3d 338, 351 (D.D.C. 2014) (finding it "reasonable [] [plaintiff's]
counsel reviewed [] 2,462 pages of documents … to ensure [] agency's compliance with FOIA").

---

[12] The survey data is a proprietary and confidential publication of the accounting firms.  Should the Court desire,
Plaintiffs will submit the data under seal.

This is especially so here, where it was *only* because of Plaintiffs' counsel's meticulous review of USAGM's productions that they realized that nearly 5,000 pages of email attachments were missing from the productions that USAGM had averred were complete and accurate. But for this painstaking review of the thousands of pages produced by USAGM, Plaintiffs would have had no way of realizing the fact, and extent, of the missing documents, particularly in light of USAGM's repeated misrepresentations on this count. *WP Co. v. U.S. Small Bus. Admin.*, 514 F. Supp. 3d 267, 278 (D.D.C. 2021) (noting that discovery of deficiencies in agency's production was only brought to light based on counsel's document review). Especially after that revelation, and in the face of USAGM's insistence that it had produced documents despite clear evidence to the contrary, the entire integrity of USAGM's production was thrown into doubt, requiring even closer analysis of the productions. Nor could an "administrative assistant or intern" have completed the review, as USAGM breezily suggests, because Plaintiffs' counsel's review entailed not only locating the missing attachments (which required close familiarity with custodians and the entire document set), but also analyzing search adequacy and the claimed exemptions in order to advise Plaintiffs about the necessity of any summary judgment challenge. *Reyes v. U.S. Nat'l Archives & Recs. Admin.*, 356 F. Supp. 3d 155, 172 (D.D.C. 2018) (concluding review of disclosed records recoverable because "counsel needed to review the documents before know[ing] whether they would need to challenge … disclosures or redactions" even though "[c]ourt was never required to resolve disclosure issues through a formal order").

Aside from grousing about Plaintiffs' counsel's document review billing entries, USAGM otherwise takes issue only with a small handful of entries, including three instances of block billing and a few for reviewing local rules. Yet courts in this District regularly reject agencies' invitations like this to engage in "nitpicking." *WP Co.*, 514 F. Supp. 3d at 279

24

(declining to engage in "nitpicking" invited by agency's objections to "several relatively minor instances of block billing"); *Coffey v. Bureau of Land Mgmt.*, 316 F. Supp. 3d 168, 171 (D.D.C. 2018) (rejecting agency's challenge to "three selected entries" of block billing "deal[ing] with minimal time periods"). Plaintiffs recognize that it is well within the Court's experience and discretion to determine the sufficiency of Plaintiffs' counsel's billing entries.

Finally, the only case cited in support of USAGM's position that Plaintiffs' charges are unreasonable–*DHS*–is inapposite. Opp. at 25 (citing 2023 WL 1778196, at *4-6). Unlike that case, this one required negotiation and preparation of 20 Joint Status Reports due to USAGM's prolonging this litigation over more than two-and-a-half years, especially exacerbated by USAGM and the U.S. Attorney's repeated attorney turnover resulting in further delays and additional time that had to be spent by counsel. Mot. at 16. And unlike that case, this litigation involved nearly 5,000 pages of missing documents from USAGM's initial production, further prolonging counsel's time spent. This alone makes clear that Plaintiffs have demonstrated that they received "more than [they] would have received by FOIA requests alone," both a "faster response" and "additional documents," unlike in *WP Co.* 2023 WL 1778196, at *6.

Plaintiffs are mindful that trial courts "need not, and indeed should not, become green-eyeshade accountants" in examining fees. *Fox v. Vice*, 563 U.S. 826, 838 (2011). In the context of this successful litigation, Plaintiffs billed reasonable time that is recoverable in full.

## IV. CONCLUSION

For the foregoing reasons and those in its opening, Plaintiffs respectfully request the Court grant its Motion and award them a total of $224,741.50 in fees and costs.

Dated: January 12, 2024                    Respectfully submitted,

                                           By:    */s/ Burt Braverman*
                                                    Burt Braverman (DC Bar No. 178376)
                                                    Meenakshi Krishnan (DC Bar No. 1617229)
                                                    DAVIS WRIGHT TREMAINE LLP
    1301 K Street, NW
    Suite 500 East
    Washington, D.C. 20005
    (202) 973-4200
    burtbraverman@dwt.com
    meenakshikrishnan@dwt.com

    Thomas R. Burke
    DAVIS WRIGHT TREMAINE LLP
    50 California Street, Suite 2300
    San Francisco, CA 94111
    415-276-6552
    thomasburke@dwt.com

    *Counsel for Plaintiffs*